UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ANDRE BANKS,**

                              **Petitioner,**

              *- against -*

**T. LaVALLEY,**

                              **Respondent.**

**11 Civ. 4437(NSR)(PED)**

**REPORT AND
RECOMMENDATION**

TO:   **THE HONORABLE NELSON STEPHEN ROMÁN
        UNITED STATES DISTRICT JUDGE**

## I. INTRODUCTION

Proceeding *pro se*, Andre Banks ("Petitioner") seeks a writ of *habeas corpus*, pursuant to

28 U.S.C. § 2254, challenging his August 17, 2007 conviction in Westchester County Court

(Zambelli, J.).  Petitioner was convicted, after a jury trial, of murder, attempted murder, assault,

robbery, and reckless endangerment in connection with an armed robbery of a delicatessen in

Greenburgh, New York.  He is currently serving a term of life imprisonment without parole.

This petition comes before me pursuant to an Order of Reference dated August 1, 2011.  (Dkt.

7.)   For the reasons set forth below, I respectfully recommend that this petition be **DENIED**.

## II. BACKGROUND

A.      **Summary of the Crime and Investigation**[1]

On July 3, 2005, at approximately 10:45 p.m., the Cibao Deli, located on Tarrytown

_____

[1] Unless otherwise indicated, the information within this section is taken from a review of
Respondent's Memorandum of Law ("Resp't's Mem.") (Dkt. 18), Respondent's Affidavit in
Opposition to Petition for Writ of *Habeas Corpus* ("Resp't's Aff.") (Dkt. 17), Appellant's Brief
("App.'s Br.") (attached to Resp't's Mem., at Ex. 13), the transcripts of the pretrial hearings and
trial (Dkts. 12-16), the accusatory (Ex. 1), and the trial court's May 18, 2007 Decision & Order
on Petitioner's pretrial suppression motions (Ex. 8).  All exhibits cited herein are attached to
Respondent's Memorandum (Dkt. 18).

Road in Greenburgh, New York, was robbed by a single, armed gunman.  Jose Pena ("Jose") and Angel Cabrera ("Angel") were both working in the kitchen of the deli when Jose saw a man approach them with his hands in his pockets.  The man smiled at Jose and Jose smiled back. Jose was able to see the man for about fifteen to twenty seconds before the man laughed, pulled a gun out of his pocket, and shot him in the chest from a distance of about five or six feet.  Jose was able to run out the back door and hide behind a car in a parking lot.  He heard a second shot, leaving Angel dead inside the deli.  Jose described the shooter as a black man, five foot seven inches tall, who weighed about 150 pounds, and who wore a grey hooded coat.

Pedro Pena ("Pedro"), the owner of the deli, counted money from the cash register, left approximately $200 next to it, and went upstairs to the apartment above the deli to eat a meal. While he was upstairs, he heard gunshots.  He came back downstairs, entered the deli, saw the shooter's face from about nine feet away, "quickly" saw the gun in his hand, saw the gun fire, and felt a bullet strike his chest.  He described the shooter as a black man, five foot six inches tall, who wore a grey hooded sweatshirt with a hood over his head that revealed only part of his face.  After he was shot, Pedro ran outside, saw the shooter fire at Nelson Pena ("Nelson"), and saw the shooter leave the scene.

Juan Guzman ("Guzman") was at work in the deli, crouching next to a glass freezer, when he saw the shooter enter the store, walk toward the back, and stop near the doorway to the kitchen.  He described the man as black and wearing a grey hooded sweatshirt.  Guzman then heard a gunshot and ran to hide in a different area of the store.  He heard a second gunshot, saw the shooter move toward the cash register, open it, and take cash out.  Guzman saw Pedro enter the store and the shooter fire at Pedro.  He then saw him take more cash out of the register.  He did not see the shooter's face.

2

Nelson was also in the upstairs apartment when he heard gunshots.  He followed Pedro downstairs but did not enter the deli.  He saw through the store's glass windows a black male in the back of the store.  The man then came outside and Nelson saw his face.  He fired at Nelson, who dove for cover and was not hit.  Nelson saw the shooter fire two more times into the stairway leading to the apartment above the deli.  At that point, Juan Pena ("Juan") was near the doorway and Cesar Pena ("Cesar") was on the stairs.  Neither were hit.  Nelson used a pay phone in front of the deli to call 911.  He then went inside the store, found Angel bleeding, picked him up, and held him as he died.

Juan was also upstairs in the apartment when he heard gunshots.  He followed Pedro and Nelson downstairs, saw Pedro enter the deli, and heard gunfire.  While he was standing in the doorway to the stairs, he yelled to those upstairs to call 911.  He then turned, saw a gun pointed at him through the open door, and heard two gunshots.  Cesar was standing behind him on the stairs but neither were hit.  Juan described the shooter as a black man wearing a grey hooded jacket.  However, he did not see the shooter's face.

Cesar was inside the deli using the microwave shortly before the store was robbed.  He looked outside and saw a black man, approximately five foot seven or eight inches tall, who weighed 150 to 160 pounds and wore a gray hoodie, walk by the store twice while looking inside the store's windows.  Cesar went upstairs and five minutes later, heard two gunshots.  He followed Pedro, Nelson, and Juan down the stairs.  He heard three more gunshots as he stood near the bottom of the stairway.  As he stood behind Juan, he saw the shooter from about ten feet away raise his arm, saw a flash, and heard two gunshots.  He recognized the shooter as the same man that he saw earlier walking in front of the store.  However, he did not see the shooter's face.

Phillip Shand ("Shand"), a high school student, was on his bike near the deli at the time

3

of the robbery.  He heard gunshots, saw people flee the deli, saw a man get shot outside the deli, and, from a distance of about forty feet, saw the shooter run from the deli into a parking lot.  He described the shooter as an African-American male, five foot six or seven inches tall, and wearing a black hoodie, dark pants, and black sneakers.  Shand spoke to police that night and gave a statement on July 11, 2005.  He did not disclose to the police at those times that, although he did not know his name at that time, he recognized the shooter from the neighborhood.  Shand later learned the name of the shooter and went to the police.  He gave another statement and identified Petitioner by name as the shooter from a photo array on September 22, 2005.  He also identified Petitioner in a lineup conducted on October 16, 2006, as well as at trial.

The police responded to the scene, collected evidence, and interviewed witnesses. Technicians determined that bullet fragments found inside the deli and the victims came from the same .38 caliber revolver.  The police issued a description of the suspect as a black male, approximately five foot, six inches tall, weighing 130 pounds, and wearing a grey hooded sweatshirt and cornrows in his hair.

Pedro and Jose were taken to the hospital.  They were shown photo arrays while in the hospital but could not identify the shooter.  Approximately thirteen months later, on August 25, 2006, they were again shown photo arrays.  This time, each identified Petitioner as the shooter. They also both identified Petitioner in a lineup conducted on October 16, 2006 and again at trial. Nelson was also shown a photo array sometime between July 5 and 10, 2005 but could not identify the shooter.  However, he identified Petitioner as the shooter during an October 16, 2006 lineup and again at trial.

Barbara Hill ("Hill") informed police that she recognized from their description an individual she knew by sight, but not name, from her neighborhood.  She testified that she saw

4

that individual near the deli at approximately 7:00 p.m. on July 3, 2005.  At that time, he was wearing dark pants and a grey hooded sweatshirt.  On July 6, 2005, she identified Petitioner as the person she saw at 7:00 p.m. in a police photo array.

On July 5, 2005, Petitioner contacted the police and agreed to accompany detectives, unhandcuffed, to the police station for questioning.  The interview lasted one hour.  Petitioner made a written statement and then left.  In that statement, he told police that he was at a barbeque at a friend's house on July 3, left, and returned to his mother's house.  His mother informed him about the robbery, and Petitioner went to the deli to try to sell bootleg movies.  He stayed there until approximately 2:00 a.m.  Petitioner also consented to the police searching his residence.

On January 11, 2006, detectives observed Petitioner at a bus stop while they were on their lunch break.  They approached Petitioner, patted him down, and spoke to him.  During this conversation, Petitioner stated "why would I kill someone for two hundred dollars?"  The detectives asked Petitioner how he knew how much money was stolen (a fact not before disclosed), and Petitioner responded that he saw that "[t]he money was spread out on the floor of the store."  Petitioner also told the detectives that he remembered he wore a grey sweatshirt, blue jeans, and sneakers on the night of July 3, 2005.

Petitioner was arrested on October 16, 2006.  Before he was read Miranda[2] warnings, he made statements concerning his prior criminal history and told detectives that he knew that no fingerprints were recovered from the crime scene.  After the warnings were read, he refused to sign a waiver card and made additional statements, including: "I was arrested enough times to

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

know what my rights are;" "I've done 14 years upstate you think I'm stupid enough to say anything to you guys;" "You guys waited too long to perform a gunshot test on me to see if I fired the gun;" and "I know you don't have my fingerprints at the scene." Petitioner also agreed to participate in a lineup.

A six-person lineup was conducted. Pedro, Jose, Nelson, and Shand each identified Petitioner as the shooter. Detectives informed Petitioner that he had been identified by Petitioner's friend, Sean Cartwright. Petitioner denied that his friend would identify him and stated, "what the fuck are you guys stupid . . . . He got into Nate's car and drove away. So how the fuck could he see what happened in the store."

## B.   Indictment

Petitioner was indicted on the following counts:

(1)     1 count of murder in the first degree, in violation of N.Y. Penal Law § 125.27(1)(a)(vii), (b), with respect to Angel (count 1 of the indictment);[3]

(2)     1 count of murder in the second degree, in violation of N.Y. Penal Law § 125.25(1), with respect to Angel (count 2 of the indictment);[4]

(3)     3 counts of attempted murder in the first degree, in violation of N.Y. Penal Law §§ 110.00, 125.27(1)(a)(vii), with respect to Jose, Pedro, and Nelson

---

[3]

A person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of robbery, . . . or in the course of and furtherance of immediate flight after committing or attempting to commit any such crime . . . [and] the victim is not a participant in . . . the aforementioned crime[ ] . . . . ; and . . . [t]he defendant was more than eighteen years old at the time of the commission of the crime."

N.Y. Penal Law § 125.27(1)(a)(vii), (b).

[4] "A person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person . . . ." N.Y. Penal Law § 125.25(a).

              (counts 3, 5, and 7 of the indictment);[5]

(4)      3 counts of attempted murder in the second degree, in violation of N.Y. Penal Law §§ 110.00, 125.25(1), with respect to Jose, Pedro, and Nelson (counts 4, 6 and 8 of the indictment);

(5)      4 counts of assault in the first degree, in violation of N.Y. Penal Law § 120.10(1), with respect to Jose and Pedro (2 counts each) (counts 9-12 of the indictment);[6]

(6)      2 counts of reckless endangerment in the first degree, in violation of N.Y. Penal Law § 120.25 (counts 13-14 of the indictment);[7]

(7)      1 count of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(2) (count 15 of the indictment);[8]

(8)      1 count of criminal possession of a weapon in the second degree, in violation of N.Y. Penal Law § 265.03(2) (count 16 of the indictment);[9] and

(9)      2 counts of criminal possession of a weapon in the third degree, in violation of N.Y. Penal Law §§ 265.02(1), (4).[10]

---

[5] "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00.

[6] "A person is guilty of assault in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." N.Y. Penal Law § 120.10(1).

[7] "A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 120.25.

[8] "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [i]s armed with a deadly weapon . . . ." N.Y. Penal Law § 160.15(2).

[9] "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another . . . [h]e possesses a loaded firearm . . . ." N.Y. Penal Law § 265.03(2), amended by 2005 N.Y. Sess. Laws ch. 764, § 3 (2005); 2006 N.Y. Sess. Laws ch. 742, § 2 (2006); id. ch. 745, § 1.

[10]

A person is guilt of criminal possession of a weapon in the third degree when . . . [s]uch person commits the crime of criminal possession of a weapon in the fourth degree as defined in subdivision one, two, three or five of section 265.01, and has been previously convicted of any crime . . . .

N.Y. Penal Law § 265.03(2). "A person is guilty of criminal possession of a firearm in the

(Ex.1.)

**C.**     <u>**Pretrial Proceedings**</u>

    **1.**     <u>*Suppression Hearings*</u>

Petitioner moved to suppress the statements he made to police and to suppress

identification testimony at trial.  (Exs. 2, 4, 7.)  The court held evidentiary hearings on May 7

and 9, 2007.  The court determined that: (1) there was probable cause for the arrest; (2) the photo

arrays were not unduly suggestive; (3) Petitioner had no right to counsel at the lineup; (4)

Petitioner's July 5, 2005 and January 11, 2006 statements were voluntarily made and therefore

admissible; and (5) the statements Petitioner made on October 16, 2006 after his <u>Miranda</u> rights

were read to him were voluntarily made, did not violate his right to counsel, and therefore

admissible.  However, the court (6) suppressed the statements Petitioner made prior to being

read his <u>Miranda</u> warnings.  (Ex. 8, at 9-12.)

On June 26, 2007, Petitioner moved to reargue the motion.  He maintained that all of the

statements made to law enforcement on October 16, 2006 should be suppressed.  The court

denied the request on July 30, 2007.[11]

    **2.**     <u>**Frye** *Hearing*</u>

_____

fourth degree when . . . [h]e possesses any firearm . . . ."  <u>Id.</u> § 265.01(1), <u>amended by</u> 2008 N.Y.
Sess. Laws ch. 257, § 4 (2008).

> A person is guilty of criminal possession of a weapon in the third degree when . . .
> [s]uch person possesses any loaded firearm.  Such possession shall not, except as
> provided in subdivision one or seven, constitute a violation of this section if such
> possession takes place in such person's home or place of business . . . .

<u>Id.</u> § 265.02(4), <u>repealed by</u> 2006 N.Y. Sess. Laws ch. 742, § 1 (2006).

[11] A copy of Petitioner's motion to reargue and the trial court's decision have not been
provided.

The defense proffered an expert in the area of eyewitness identification reliability. Steven D. Penrod, Ph.D., J.D. ("Penrod"), a professor at the John Jay College of Criminal Justice, was retained to provide expert testimony on the following factors: (1) stress, (2) the exposure time of a witness to a perpetrator,[12] (3) partial disguise worn by a perpetrator, (4) retention interval,[13] (5) the confidence of a witness in his or her identification, (6) cross-race bias, (7) mug shot induced bias,[14] and (8) weapons focus.[15]  People v. Banks, 842 N.Y.S.2d 313, 315-16 (Sup. Ct. Westchester Cnty. 2007).  The court conducted a pretrial Frye hearing on June 14 and 28, 2007.[16]  The court held that testimony regarding five out of the eight factors would be

---

[12] "'Increased exposure time' refers to the phenomenon that a [sic] longer a person is exposed to a face the more likely that person will make a correct identification at a later time . . . ." People v. Banks, 842 N.Y.S.2d 313, 315 n.1 (Sup. Ct. Westchester Cnty. 2007) (citation omitted).

[13] "The 'retention interval' was defined at the Frye hearing by defendant's expert as the time between the initial viewing of the perpetrator by the witness and the witness' subsequent identification of someone as the perpetrator . . . ." Banks, 842 N.Y.S.2d at 316 n.2 (citation omitted).

[14] "'Mug shot induced bias' occurs when a witness sees a mug shot or photo array containing a suspect and then is more likely to identify the suspect later in a lineup, regardless of whether or not the suspect is the actual perpetrator . . . ." Banks, 842 N.Y.S.2d at 316 n.3 (citation omitted).

[15] "Weapon focus" is the phenomenon which occurs when, during the course of a crime, a witness is exposed to a weapon, and the witness focuses his or her attention on the weapon and not on the perpetrator's face, which impairs the ability of the witness to make a subsequent identification of the perpetrator . . . .

Banks, 842 N.Y.S.2d at 316 n.4 (citation omitted).

[16] In New York, courts assessing the admissibility of expert testimony apply the four prong test set forth in Frye v. United States, [293 F. 1013 (1923)].  Using the Frye test, the court must determine whether such proposed testimony is (1) relevant to the witness' identification, (2) proffered by a qualified expert, (3) on a topic beyond the ken of the average juror and (4) based on principles that are generally

9

admissible at trial: exposure time, retention interval, confidence, mug shot induced bias, and weapons focus. It excluded testimony regarding the effects of stress, partial disguise, and cross-race bias (between a Hispanic witness and an African-American perpetrator) on the basis that Petitioner failed to show that the expert's opinion was based on principles generally accepted as reliable in the relevant scientific community. See id. at 325.

**D.    Trial**

During trial, the detective testified on cross-examination that, after Petitioner was read his Miranda rights–including the right to remain silent–Petitioner told the detectives that he "was not going to say anything," yet was questioned anyway. (Tr., at 902-03 (Dkt. 12).[17])  After the

---

accepted as reliable by the scientific community. Moreover, the admissibility and bounds of expert testimony are addressed primarily to the sound discretion of the trial court.

Banks, 842 N.Y.S.2d at 319 (internal citations omitted).

[17] The testimony went as follows:

Q:    Thank you.  Before the lineup you advised my client of his rights; is that correct?
A:    Yes.
Q:    And he said, I'm not giving a written statement; is that a fact?
A:    Yes.
Q:    He says, I'm not speaking to you guys; is that correct?
A:    Yes.
Q:    Well, you had just advised him of the right to remain silent?
A:    He said he was not going to say anything to us.
Q:    And he did not speak; is that correct?
A:    Um-hum.
Q:    And you had just advised him of the right to be silent; is that correct?
A:    Yes.
Q:    He said I'm not going to say anything to you guys; is that correct?
A:    Yes.
Q:    Then you began to question him?
A:    He didn't acknowledge his rights, he refused to sign the form.
Q:    And then you began to question him?

10

detective completed his testimony, defense counsel "renew[ed his] motion to suppress" Petitioner's statements. (Id. at 956.) The court held that the detective's testimony at trial was substantively different than his testimony at the pretrial suppression hearing, where he testified only that Petitioner refused to sign anything or to provide a written statement. (Id. at 958-59; see id. at 959 (emphasis added) ("There was never a time during the suppression hearing that he, the witness, explains that [Petitioner] told [the detectives] he wasn't going to *talk* to them.").) The court held that "[i]t is clear that defendant invoked his right to remain silent." (Id. at 960.) The court offered to declare a mistrial but defense counsel declined. Instead, counsel asked that the jury be directed "to disregard any reference to the statement alleged to have been made by Andre Banks on October 16 of '06." (Tr., at 1019 (Dkt. 16); see id. at 1034.) The court accepted counsel's proposed curative instruction and instructed the jury the following:

> Members of the jury, before we proceed I'm going to give you a curative instruction. I direct you to disregard any reference to the statement alleged to have been made by Andre Banks to Detective Uhlitzsch on October 16, 2006. I further direct you to disregard any reference to the defendant's alleged statement in cross-examination by Mr. Volper.

(Tr., at 1039; see also id. at 1064, 1293 (providing expanded instructions).)

**E.**   **Verdict and Sentence**

The jury returned a verdict on August 17, 2007 and found Petitioner guilty of: murder in the first degree (one count), attempted murder in the first degree (three counts), assault in the first degree (two counts), robbery in the first degree (one count), and reckless endangerment in the first degree (two counts). (Id. at 1368-69.)

----

    A:     Yes.

(Tr., at 902-03.)

11

On October 9, 2007, Petitioner was sentenced as a second felony offender to: life imprisonment without the possibility of parole for the murder conviction; twenty-five years to life imprisonment for each of the attempted murder convictions; twenty-five years plus five years post-release supervision for each of the assault convictions and for the robbery conviction; and three and one-half to seven years imprisonment for each of the reckless endangerment convictions.  The court ordered that each attempted murder sentence run consecutive to each other and to all other sentences, and that the remaining sentences run concurrently.

**F.**   **Direct Appeal**

Petitioner was represented by different counsel on direct appeal.  He raised five claims in his brief to the New York State Appellate Division, Second Department:

(1)   "the prosecutor's summation deprived appellant of a fair trial;"

(2)   "the court erred in refusing to allow expert testimony on the effect of stress or cross-race bias on identification;"

(3)   the court erred when it admitted into evidence Shand's pretrial photo array identification because "the defense did not open the door" to this evidence;

(4)   "the court erred in denying the defense request for Rosario sanctions;" and

(5)   "the lack of qualification of the court interpreter requires reversal of the conviction."

(App.'s Br., at *i* (typeface altered from original).)  By *pro se* supplemental brief, Petitioner raised the following claims:

(6)   the evidence was legally insufficient to support the conviction and the verdict was against the weight of the credible evidence adduced at trial;

(7)   the "court erred when it denied defense request for a mistrial, when victim and mebers [*sic*] of victim's family engaged in an emotional outburst in front of jury;" and

(8)   Petitioner "was denied his due process right to a fair trial, when (a) the interpreter failed to accurately interpret witness testimony, and (b) substituted his own assesment [*sic*] of what witness meant, instead of providing a verbatim interpretation of testimony."

(Supplemental Pro Se Br. ("Pro Se Br."), at 2 (typeface altered from original) (Ex. 18).)

The Second Department affirmed the judgment in a written decision on June 22, 2010. People v. Banks, 905 N.Y.S.2d 627 (App. Div. 2d Dep't 2010). By letter dated July 1, 2010, appellate counsel sought leave to appeal to the New York Court of Appeals. (Ex. 18.) By letter dated August 4, 2010, Petitioner, proceeding *pro se*, sought leave to appeal. (Ex. 19.) Leave was denied on September 7, 2010. People v. Banks, 15 N.Y.3d 849 (2010). Petitioner did not seek a writ of *certiorari* to the United States Supreme Court, nor has he sought state collateral relief. (See Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Pet.") ¶¶ 10(g), 11 (Dkt. 1).)

**F.**     ***Habeas Corpus* Proceedings**

By petition dated June 5, 2011, Petitioner seeks a federal writ of *habeas corpus*.[18] He raises the same claims that were raised on direct appeal. (Id. ¶ 13.)

## III. DISCUSSION

**A.**     **Applicable Law on *Habeas Corpus* Review**

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)). Before a federal district court may review the merits of a state criminal judgment in a *habeas corpus* action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If there has been procedural compliance with these statutes, the court must then determine the appropriate standard of review applicable to the petitioner's claim(s) in accordance with § 2254(d). The procedural and substantive standards applicable to *habeas* review, which were substantially modified by the Anti-Terrorism and Effective Death Penalty

---

[18] The petition was timely filed. See 28 U.S.C. § 2244(d).

Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1220 (Apr. 24, 1996), are summarized below.

### 1.     *Timeliness Requirement*

A federal *habeas* petition is subject to AEDPA's strict, one-year statute of limitations. See 28 U.S.C. § 2244(d).  The statute provides four different potential starting points for the limitations period, and specifies that the latest of these shall apply.  See id. § 2244(d)(1).  Under the statute, the limitation period is tolled only during the pendency of a properly filed application for State post-conviction relief, or other collateral review, with respect to the judgment to be challenged by the petition.  See id. § 2244(d)(2).  The statute reads as follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (d)(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Id. § 2244(d).

The one-year limitation period is subject to equitable tolling, which is warranted when a petitioner has shown "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way' and prevented timely filing." Holland v. Florida, 130 S. Ct. 2549, 2562 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). "The

term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011). "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline." Id. Finally, "[c]onsistent with the maxim that equity aids the vigilant, a petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that he acted with reasonable diligence throughout the period he seeks to toll." Id. at 138 (internal quotation marks and citations omitted); see also Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000) (the applicant for equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances").

   2.   ***Exhaustion Requirement***

   A federal court may not grant *habeas* relief unless the petitioner has first exhausted his claims in state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); id. § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented"). The exhaustion requirement promotes

15

interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claim.  Rose v. Lundy, 455 U.S. 509, 518-19 (1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted).  "Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims." Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984) (citing Smith v. Phillips, 455 U.S. 209, 221 (1982)).  Such notice requires that the petitioner "apprise the highest state court of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition." Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).  A claim may be "fairly presented" to the state courts therefore, even if the petitioner has not cited "chapter and verse of the Constitution," in one of several ways:

> (a) [R]eliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye v. Attorney Gen. of N.Y., 696 F.2d 186, 194 (2d Cir. 1982).  A *habeas* petitioner who fails to meet a state's requirements to exhaust a claim will be barred from asserting that claim in federal court.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim

procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation omitted). "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). Such a procedurally barred claim may be deemed exhausted by a federal *habeas* court. See, e.g., Reyes, 118 F.3d at 139. However, absent a showing of either "cause for the procedural default and prejudice attributable thereto," Harris v. Reed, 489 U.S. 255, 262 (1989), or "actual innocence," Schlup v. Delo, 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

Finally, notwithstanding the procedure described above, a federal court may yet exercise its discretion to review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless." Rhines v. Weber, 544 U.S. 269, 277 (2005); see § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also, e.g., Padilla v. Keane, 331 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (interests in judicial economy warrant the dismissal of meritless, unexhausted claims).

### 3.   *Procedural Default*

Even where an exhausted and timely *habeas* claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon "an adequate and independent finding of a procedural default" to deny it. Harris, 489 U.S. at 262; see also Coleman v. Thompson, 501 U.S. 722, 730 (1991); Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995).

A state court decision will be "independent" when it "fairly appears" to rest primarily on

state law.  Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006) (citing Colman, 501 U.S. at 740).  A decision will be "adequate" if it is "'firmly established and regularly followed' by the state in question."  Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (quoting Ford v. Georgia, 498 U.S. 411, 423-24 (1991)).  The determination of whether a state procedural rule is "firmly established and regularly followed" requires inquiry into "the specific circumstances presented in the case."  Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (citing Lee v. Kemma, 534 U.S. 362, 386-87 (2002)).  The Second Circuit has identified three "guideposts" for making this determination:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether the state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, legitimate government interest.

Id. (citing Lee, 534 U.S. at 381-85).

### 4.     *AEDPA Standard of Review*

Before a federal court can determine whether a petitioner is entitled to federal *habeas* relief, the court must determine the proper standard of review under AEDPA for each of the petitioner's claims.  § 2254(d)(1)-(2).  This statute "modifie[d] the role of federal habeas corpus courts in reviewing petitions filed by state prisoners," and imposed a more exacting standard of review.  Williams v. Taylor, 529 U.S. 362, 402 (2000).  For petitions filed after AEDPA became effective, federal courts must apply the following standard to cases in which the state court adjudicated on the merits of the claim:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)-(2).  The deferential AEDPA standard of review will be triggered when the state court has both adjudicated the federal claim "on the merits," and reduced its disposition to judgment.  Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).  Where the state court "did not reach the merits" of the federal claim, however, "federal habeas review is not subject to the deferential standard that applies under AEDPA . . . .  Instead, the claim is reviewed *de novo*." Cone v. Bell, 556 U.S. 449, 472 (2009); see § 2254(d).

Under the first prong of the AEDPA deferential standard, a state court decision is contrary to federal law only if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413.  A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from the Supreme Court cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Id. at 407.

> Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court. . . .  If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . .  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's

19

precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the federal claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.

Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011) (internal quotation marks and citations omitted).

Under the second prong of AEDPA, the factual findings of state courts are presumed to be correct. § 2254(e)(1); see Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (citing Green v. Scully, 850 F.2d 894, 900 (2d Cir. 1988) ("'[t]he factual findings of the New York Courts are presumed to be correct'"). The petitioner must rebut this presumption by "clear and convincing evidence." § 2254(e)(1).

## B.    **Analysis of Petitioner's Claims**[19]

### 1.    ***Prosecutorial Misconduct (Claim One)***

Petitioner argues that his constitutional right to a fair trial was violated as a result of the prosecutor's summation. Specifically, Petitioner argues that the prosecutor improperly (1) argued that the reason why police did not recover a grey sweatshirt during their search of Petitioner's residence was because Petitioner learned from news reports that the police description of the suspect included the shirt and therefore Petitioner disposed of it prior to the search; and (2) speculated that inconsistencies in Jose's testimony were attributable to a lack of clarity by the interpreter. (See App.'s Br., at 25-29.) Respondent contends, in part, that this claim remains procedurally barred from *habeas* review. (See Resp't's Mem., at 30-38.)

_____

[19] I identify the claims as I list them in Section II(F) above.

20

Respondent is correct.

The Second Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address Claim One. <u>See</u> <u>Ylst</u>, 501 U.S. at 803. It is clear that the court actually relied upon New York State's contemporaneous objection rule to deny this claim. Specifically, it held:

> The defendant's contention that he was deprived of a fair trial by certain remarks made by the prosecutor during summation is unpreserved for appellate review, as the defendant either failed to object to the comments or made only general objections, and did not request further curative instructions or move for a mistrial (<u>see</u> CPL 470.05(2) . . . .).

<u>Banks</u>, 905 N.Y.S.2d at 628 (citation omitted).[20]

While the court went on to alternatively dismiss the claim on the merits, <u>see id.</u> (stating "[i]n any event, the challenged remarks were a fair comment on the evidence, permissible rhetorical comment, or responsive to defense counsel's summation"), its reliance on the state procedural rule constitutes an independent and adequate ground for its decision denying the claim, and therefore precludes this Court from considering the claim on *habeas* review, <u>see</u> <u>Harris</u>, 489 U.S. at 264 n.10 (state court decision that relies on a procedural rule to dismiss a

---

[20] New York's contemporaneous objection rule provides:

For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.

N.Y. Crim. Proc. Law § 470.05(2). Accordingly, this rule requires that "an objection to a ruling or instruction of a criminal court . . . be raised contemporaneously with the challenged ruling or instruction in order to preserve the objection for appellate review." <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005) (citing <u>People v. Jones</u>, 440 N.Y.S.2d 248, 254 (App. Div. 2d Dep't 1981)).

claim, but which, in the alternative, also proceeds to dismiss the claim on the merits, relies on the

independent state law ground for dismissal); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810

n.4 (2d Cir. 2000) (noting that when a state court opines that a claim is "not preserved for

appellate review" and then rules "in any event" that the claim also fails on its merits, the claim

rests on the independent state law rule which precludes federal *habeas* review); see also

Wainwright v. Sykes, 433 U.S. 72, 86 (1977) (contemporaneous objection rule constitutes

adequate procedural ground for dismissal); Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir.

1994) (same); see also, e.g., Williams v. Ercole, No. 09 Civ. 363(SJF), 2011 WL 4944268, at *6

(E.D.N.Y. Oct. 12, 2011) (Appellate Division's invocation of N.Y. Crim. Proc. Law § 470.05(2)

constitutes independent and adequate state procedural ground that precludes federal *habeas*

review); Martin v. Brown, No. 08 Civ. 316(JFB), 2010 WL 1740432, at *7 (E.D.N.Y. Apr. 29,

2010) (same).[21]  Petitioner does not assert cause and prejudice, nor allege a resulting

fundamental miscarriage of justice, that would permit this Court to circumvent his procedural

default and review the merits of the claim.  (See Pet'r's Reply/Traverse to Prosecution Opp'n to

Pet'r's Fed. Habeas Corpus Pursuant to Rules Governing § 2254 Cases in the U.S. Dist. Cts.,

2254 (5)(e) ("Pet'r's Reply"), at 10-11 (Dkt. 23).)

Accordingly, Claim One must be denied.

### 2. *Expert Testimony (Claim Two)*

Petitioner argues that the trial court's Frye hearing decision that precluded him from

introducing expert testimony on the effect of stress and cross-race bias on the reliability of

eyewitness identifications, deprived him of his federal constitutional rights to due process, a fair

---

[21] Copies of unreported cases cited herein will be mailed to Petitioner as a *pro se* litigant. See Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009) (per curiam).

trial, and to present a complete defense.  (See App.'s Br., at 30-33.)  Respondent contends this

claim fails to present a federal question that is cognizable upon *habeas* review.  (Resp't's Mem.,

at 39-43.)  I agree with Respondent that the claim should be denied.

The Second Department's written decision on Petitioner's direct appeal represents the

last-reasoned state court decision to address Claim Two.  See Ylst, 501 U.S. at 803.  It is clear

that it denied the claim on the merits.  Specifically, it held:

> The County Court providently exercised its discretion in precluding, after a
> Frye hearing . . . expert testimony on the effects of stress and cross-race bias on
> eyewitness identification.  The defendant failed to meet his burden of establishing
> that the proposed testimony was based on principles that are generally accepted in
> the scientific community . . . .

Banks, 905 N.Y.S.2d at 628 (citations omitted).  Accordingly, I address Claim Two pursuant to

AEDPA's deferential standard of review.

First, it is clear that "[n]o Supreme Court decision has held that the exclusion of expert

testimony on the reliability of eyewitness identifications violates a defendant's constitutional

rights."  Burwell v. Superintendent of Fishkill Corr. Facility, No. 06 Civ. 787(JFK), 2008 WL

2704319, at *6 (July 10, 2008); see also, e.g., Smith v. Graham, No. 10 Civ. 3450(JPO)(THK),

2012 WL 2428913, at *6 (S.D.N.Y. May 7, 2012) (Report & Recommendation), adopted by

2012 WL 2435732 (S.D.N.Y. June 27, 2012) ("[t]here is no clearly established right under the

federal Constitution to call an expert witness concerning the reliability of eyewitness

testimony").  Accordingly, the state court's decision denying Claim Two was not "contrary to"

clearly established federal law.  28 U.S.C. § 2254(d)(1).

Nor was the court's denial of this claim "an unreasonable application of" federal law.  Id.

The Confrontation Clause of the Sixth Amendment of the U.S. Constitution guarantees the right

of a criminal defendant "to be confronted with the witnesses against him."  U.S. Const. Amend.

VI.  This right of confrontation also embodies the right of a defendant to "a meaningful

opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986)

(internal quotation marks and citation omitted).  The right to present a complete defense includes

the "fundamental right . . . of an accused to present witnesses in his own defense."  Chambers v.

Mississippi, 410 U.S. 284, 302 (1973).  The right to present evidence, however, is not absolute,

see, e.g., Taylor v. Illinois, 484 U.S. 400, 411 (1988); Chambers, 410 U.S. at 302; Washington v.

Schriver, 255 F.3d 45, 55 (2d Cir. 2001), and "'may, in appropriate cases, bow to accommodate

other legitimate interests in the criminal trial process,'" Michigan v. Lucas, 500 U.S. 145, 149

(1991) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)).  Specifically, a state court may

"exclude evidence through the application of evidentiary rules that serve the interests of fairness

and reliability."  Wade v. Mantello, 333 F.3d 51, 58 (2d Cir. 2003) (citing Taylor, 484 U.S. at

410).

      A federal writ of *habeas corpus* may be issued only where the prisoner "is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).

As such, "[f]ederal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers,

497 U.S. 764, 779 (1990); accord Estelle v. McGuire, 502 U.S. 62, 67 (1991).  Because a state

court's evidentiary rulings are within the province of state law, any error in those rulings

warrants *habeas* relief only if it is "of [a] constitutional magnitude" and "not harmless."  Perez v.

Phillips, 210 F. App'x 55, 57 (2d Cir. 2006) (quotation omitted); see also Crane, 476 U.S. at 689

("[w]e acknowledge . . . our traditional reluctance to impose constitutional constraints on

ordinary evidentiary rulings by state trial courts").  "Whether the improper evidentiary ruling

was an error of constitutional magnitude is itself a two-step analysis.  That is, [the court must]

examine 1) whether the exclusion was error under state law, and 2) whether the error amounted

to the denial of the constitutional right to a fundamentally fair trial." Perez, 210 F. App'x at 57

(internal quotation marks and citation omitted). "Whether a trial was rendered unfair by error

(and therefore an error of constitutional magnitude) has been described as a situation where 'the

omitted evidence creates a reasonable doubt that did not otherwise exist.'" Id. (quoting United

States v. Agurs, 427 U.S. 97, 112 (1976)). "In other words, whether there is constitutional error

depends on 'whether the excluded evidence was *material* to the presentation of the defense.'"

Id. (quoting Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983)) (emphasis in original). "In order

to determine whether the omission was material, 'the omission must be evaluated in the context

of the entire record. If there is no reasonable doubt about guilt whether or not the additional

evidence is considered, there is no justification for a new trial.'" Id. (quoting Agurs, 427 U.S. at

112-13); see also, e.g., Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (quoting Agurs, 427

U.S. at 112) (emphasis in original) (internal citations omitted) ("When evidence is erroneously

*excluded* the test for determining whether the ruling denied the defendant a fair trial is whether it

would have created 'a reasonable doubt that did not otherwise exist.' In applying that test we

therefore evaluate what the impact of the excluded evidence would have been if it had been

admitted.").

     In this case, the state court's Frye hearing decision cannot be said to be erroneous as a

matter of New York evidentiary law. The court held that the proposed testimony regarding the

effects that stress and Hispanic–African-American racial bias may have on the reliability of

eyewitness identifications were not based on principles generally accepted as reliable by the

relevant scientific community. Under New York law, "expert testimony based on scientific

principles or procedures is admissible but only after a principle or procedure has 'gained general

acceptance' in its specified field." People v. Wesley, 83 N.Y.2d 417, 422 (1994) (quoting Frye,

293 F. at 1014); see also, e.g., People v. Johnston, 709 N.Y.S.2d 230, 236 (App. Div. 3d Dep't

2000) (citations omitted) ("[d]espite the U.S. Supreme Court's opinion in Daubert v. Merell

Dow Pharms., 509 U.S. 579 (1993), [New York State courts] continue to apply the stricter

'general acceptance' test of Frye v. United States . . . in cases where the reliability and

admissibility of scientific evidence are in issue."). "The burden of proving general acceptance in

the relevant scientific community rests upon [the] proponent of the disputed testimony." People

v. Williams, 830 N.Y.S.2d 452, 465 (Sup. Ct. Kings Cnty. 2006). "It is important to appreciate .

. . that it is not the responsibility of a trial judge under Frye to determine whether or not a novel

scientific theory, principle or procedure *is in fact reliable* but only whether it is *generally*

*accepted as such by the relevant scientific community.*" Id. (emphasis in original). To

accomplish this, the court must "count the number and percentage of scientists favoring the

principle, not measure its soundness." Id. (citing Parker v. Mobil Oil Corp., 7 N.Y.3d 434

(2006)).

　　　　Penrod testified at the Frye hearing that his opinions were based on principles generally

accepted as reliable in the relevant scientific community. In support of this, he referenced a

meta-analysis and a study. However, that research was not introduced as evidence at the

hearing. Banks, 842 N.Y.S.2d at 321. On cross-examination, the prosecution admitted into

evidence a survey that found that "only 4 of 64 respondents found the proposition that 'very high

levels of stress impair the accuracy of eyewitness testimony' to be very reliable and only 19 of

64 respondents found the proposition to be generally reliable." Id. In response, Penrod

subsequently conducted his own "updated" survey sometime between the June 14 and 28, 2007

hearing dates. His results were admitted into evidence on June 28. His new survey found that

"34 of 63 respondents found the proposition regarding stress to be either generally or very

reliable." Id. at 322.  The court noted that more than half of the respondents agreed with the principle, but also that Penrod allowed the respondents only 30 hours to answer the survey, that the survey was created for purposes of the litigation, and that the survey was not yet published and therefore not subjected to peer review.  Id. at 323.  The court held that Petitioner failed to meet his burden to show that a general consensus as to the reliability of the research existed.  Id.

    In support of his contention that cross-racial bias may affect the reliability of witness identifications, Penrod referenced a meta-analysis (but did not admit it into evidence).  However, he admitted that the research involved only Caucasian–African-American subjects and Caucasian–Hispanic subjects.  The court determined that Petitioner failed to meet his burden to show that a cross-race bias with respect to Hispanic witnesses and African-American perpetrators existed.  See id. at 324.

    The court's decisions were not erroneous.  First, it was an appropriate exercise of judicial discretion for the court to give less weight to the *ad hoc* research conducted by Penrod, and more weight to the research admitted into evidence by the prosecution.  See, e.g., Williams, 830 N.Y.S.2d at 462-63 (citing People v. Drake, 7 N.Y.3d 28 (2006) and People v. Young, 7 N.Y.3d 40 (2006)).  Accordingly, the quantitative evidence admitted at the hearing revealed that less than half of those surveyed found a measure of reliability in Penrod's proffered testimony regarding the effect of stress.  Second, Petitioner failed to introduce any scientific evidence of Hispanic–African-American racial bias.  The court's decision precluding the expert from testifying about these factors on the ground that they were not based on generally accepted principles, was therefore appropriate.

    Petitioner also argues that the state court misapplied the New York State Court of Appeals's decision in People v. LeGrand, 8 N.Y.3d 449 (2007).  Petitioner is incorrect.  In

27

LeGrand, the Court held that,

> [W]here the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witnesses's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror.

8 N.Y.3d at 452.  Accordingly, under LeGrand, a trial court abuses its discretion if it a) excludes proffered expert testimony that has passed the Frye test, and b) the prosecution's case rests almost entirely on witness identifications.  In addition, the Court in LeGrand noted that,

> [E]xpert opinion testimony regarding the reliability of an eyewitness identification should be treated in the same manner as testimony offered by other experts.  A court need not hold a Frye hearing where it can rely upon previous rulings in other court proceedings as an aid in determining the admissibility of the proffered testimony.  Once a scientific procedure has been proved reliable, a Frye inquiry need not be conducted each time such evidence is offered [and courts] may take judicial notice of the general procedure . . . .

Id. at 458 (internal quotation marks and citation omitted).

In this case, unlike in LeGrand, the trial court determined that Penrod's testimony regarding stress and Hispanic–African-American bias did *not* pass the Frye test.  Accordingly, use of the court's discretion to preclude this testimony from trial was not abusive.  Additionally, even if it is presumed that other New York State courts have found expert testimony regarding such factors to be based on reliable principles, the LeGrand decision did not *preclude* a trial court from conducting a Frye hearing.  Rather, it only suggested that a court "may take judicial notice" of those decisions.  Id.  The trial court's failure in this case to take judicial notice of any decisions was therefore not contrary to LeGrand.  Accordingly, Petitioner cannot show that the state court's evidentiary decisions were erroneous as a matter of state law.

In any event, even if the state court did err in its evidentiary decisions, Petitioner cannot

28

show that the errors deprived him a fair trial because he cannot show that the inclusion of the evidence would have created a reasonable doubt that did not otherwise exist. "The testimony which Petitioner sought to introduce concerned the general reliability of eyewitnesses, but did not directly contradict any of their testimony." Smith, 2012 WL 2428913, at *6. At most, such excluded evidence would have only affected the jury's determination of the credibility of the eyewitnesses' identifications of Petitioner as the shooter. Petitioner was able to cross-examine the witnesses at trial and test the reliability of their identifications. See, e.g., id. (citing Smith v. Smith, No. 02 Civ. 7308(WHP)(JCF), 2003 WL 22290984, at *7 (S.D.N.Y. Sept. 29, 2003)) (no error of constitutional magnitude where state court precluded expert from testifying as to reliability of eyewitness identification, in part, where petitioner was able to cross-examine eyewitnesses at trial). Moreover, Penrod was permitted to testify about the reliability of eyewitness identifications with respect to several other factors. Without more, Petitioner cannot show that the expert's opinion concerning stress and racial bias would have created a reasonable doubt about Petitioner's guilt.

 The state court's denial of this claim was therefore neither contrary to, nor an unreasonable application of, clearly established federal law. Claim Two should be denied.

  **3.**   ***Photographic Identification (Claim Three)***

 At trial, defense counsel cross-examined Shand about his failure to initially disclose to police that he recognized the shooter from his neighborhood. He then questioned Shand about the number of occasions following the shooting that Shand spoke with police. Shand testified that he was initially reluctant to inform the police that he recognized Petitioner because he feared for his safety and his family's safety. He also testified that he spoke to police about four times after he made his first statement. Defense counsel then asked Shand the following:

29

> Q.   So, I would suggest to you that the reason you didn't tell the police you
> recognized the person wasn't because of fear for your family, but because
> you didn't recognize the person, did you?
>
> A.   That's false, sir.

(Tr., at 474.)  The court determined that counsel's questions invited the jury to speculate that

Shand identified Petitioner at the lineup due to detectives "plant[ing] the seed that [Petitioner]

was the perpetrator."  (Id. at 475.)  It ruled that counsel opened the door to the prosecutor

seeking to question Shand on redirect examination about evidence it previously ruled

inadmissible–namely, the September 22, 2005 pretrial photo identification in which Shand

positively identified Petitioner as the shooter.

Petitioner now argues that the trial court erred by ruling that defense counsel opened the

door to testimony about Shand's pretrial photographic identification.  (See App.'s Br., at 34-35.)

Respondent contends this claim is not cognizable upon *habeas* review.  (Resp't's Mem., at 44-

48.)  I agree with Respondent that the claim should be denied.

The Second Department's written decision on Petitioner's direct appeal represents the

last-reasoned state court decision to address Claim Three.  See Ylst, 501 U.S. at 803.  It is clear

that it denied the claim on the merits.  Specifically, it held:

> Contrary to the defendant's contention, it was not improper for the prosecutor
> to elicit testimony on redirect examination that the witness had previously identified
> the defendant from a photographic array.  Such testimony is appropriate when, as
> here, the defendant opens the door to this type of inquiry during cross-examination
> of the witness . . . .

Banks, 905 N.Y.S.2d at 629.  Accordingly, I address Claim Three pursuant to AEDPA's

deferential standard of review.

As discussed above, any error in a state trial court's evidentiary ruling will not warrant

*habeas* relief unless the ruling is "of a constitutional magnitude" and "not harmless."  Perez, 210

30

F. App'x at 57 (quotation omitted). "Whether the improper evidentiary ruling was an error of constitutional magnitude is itself a two-step analysis. That is, [the court must] examine 1) whether the exclusion was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." Id. (internal quotation marks and citation omitted).

In this case, the trial court's decision was not erroneous as a matter of New York State evidentiary law. It is clear that, under New York law, "[w]hen a party 'opens the door' during cross-examination to excluded evidence, the opponent may seek to admit the excluded evidence in order to explain, clarify and fully elicit the question that has been only partially exposed on cross examination." People v. Mateo, 2 N.Y.3d 383, 779 (2004). Here, defense counsel's cross-examination sought to portray Shand as having identified Petitioner as the shooter at the lineup because he was persuaded by police to do so–and not because he independently recognized him as the shooter. It was accordingly proper for the prosecutor to seek to introduce evidence showing that Shand had previously identified Petitioner as the shooter.

In any event, even if the trial court's decision was erroneous, Petitioner cannot show that the error deprived him of a fundamentally fair trial because Shand's testimony concerning the photo array was simply not "highly significant." Collins, 755 F.2d at 19 (internal quotation marks and citation omitted); see also id. (evidence is improperly admitted where, "viewed objectively in light of the entire record before the jury, [it] was sufficiently material to provide the basis for conviction"). "The testimony which Petitioner sought to [exclude] concerned the general reliability of [an] eyewitness[ ], but did not directly contradict any of [his] testimony." Smith 2012 WL 2428913, at *6. At most, Shand's re-direct testimony would have only affected the jury's determination of the credibility of his overall testimony. Moreover, Shand was one of

*several* eyewitnesses who identified Petitioner at trial as the shooter.  Without more, the admission of testimony regarding Shand's pretrial photo identification did not provide the basis for Petitioner's conviction.

The state court's denial of this claim was therefore neither contrary to, nor an unreasonable application of, clearly established federal law.  Claim Three should be denied.

### 4.   **Rosario *Violation (Claim Four)***

At trial, Nelson testified that the police took notes when they interviewed him.  (Tr., at 695.)  Defense counsel demanded production of those notes and sought sanctions for the prosecution's failure to produce them pretrial.  The prosecutor represented to the court that all existing police notes had in fact been produced during discovery.  The court denied defense counsel's request for sanctions and Petitioner now argues that this was in error.  (Id. at 700-01, 709-10; see App.'s Br., at 36.)  Respondent contends, in part, that the claim remains unexhausted and procedurally barred from *habeas* review because Petitioner failed to raise this claim in his letter applications seeking leave to appeal from the New York State Court of Appeals.  Respondent is correct.

The *pro se* letter written by Petitioner discussed only claims he raised in his supplemental *pro se* appellate brief.  Accordingly, Claim Four was not raised therein.  (Ex. 19.)  In addition, the letter written by appellate counsel specifically discussed only the issues identified in Claims One, Two, and Three above.  (Ex. 18, at 1-4.)  That letter also stated that, "[a]s to the remaining issues on appeal and to supplement the issues presented herein, appellant respectfully refers the Court to the main brief on appeal and appellant's pro se brief, the arguments of which are incorporated herein by reference."  (Id. at 4.)  Both briefs were then attached to the letter sent by appellate counsel.

32

It is well-settled that, where a letter application seeking leave to appeal discusses specific claims, those claims not specifically identified are not "fairly presented" to the state's highest court and therefore remain unexhausted for purposes of federal *habeas* review.  McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 75 (2d Cir. 2011), cert. denied, 132 S. Ct. 1151 (2012) (citing Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000)) ("merely including an appellate brief with a leave application that discusses some but not all of the claims addressed in that brief is insufficient to inform the New York Court of Appeals that leave is being sought with respect to claims other than those mentioned in the letter seeking leave to appeal to the Court of Appeals").

Additionally, the Second Circuit has held that, "arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims."  Jordan v. Lefevre, 206 F.3d 196, 198 (2d Cir. 2000).  In Jordan, the petitioner "forcefully argued [one] claim in the first three paragraphs of his application for leave, but made no reference to his other claims.  In the fourth paragraph . . . he asked that he be given permission to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.'"  Id.  The Second Circuit concluded that,

> [A]rguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement . . . .  Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave.

Id. at 198-99.  In contrast, in Morgan, the petitioner did not identify or discuss a specific claim.  Instead, he attached his briefs and "request[ed that the] Court . . . consider and review all issues outlined in defendant-appellant's brief and pro se supplemental brief."  204 F.3d at 369-70 (emphasis and quotation marks omitted).  The Second Circuit held that all claims raised in those

33

briefs were fairly presented to the state's highest court for purposes of *habeas* review.  Id. at 371.

The Second Circuit later explained that the distinction between Jordan and Morgan lies in the language of the appellants' requests to the New York Court of Appeals.  Accordingly, the determination of whether a claim has been "fairly presented" to the state's highest court depends upon how clear the request to review the claim is–*i.e.*, it is dependent upon what exactly the appellant requested the court do.  Specifically, in Ramirez v. Attorney General of State of New York, 280 F.3d 87 (2d Cir. 2001), the Second Circuit stated that it:

> [P]erceive[s] the line drawn between Morgan and Jordan to be as follows. References to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal. In Morgan, the language unmistakably requested review of each point in the Appellate Division brief. In Jordan, the words "for all of these reasons and the reasons set forth in [the] Appellate Division briefs" might as easily have been a reference to additional reasons for reviewing the [specifically identified] claim as an incorporation of other, different claims asserted in the lower court.

280 F.3d at 97.

Here, appellate counsel's letter application seeking leave to appeal specifically identified three claims, and merely "refer[ed]" the Court of Appeals to the remaining arguments discussed in the appellate briefs.  This language did not "clearly inform[ ]" the court that Petitioner requested review of those additional claims as bases for his appeal.  Id.  This failure means that the claims have not been fairly presented to the state's highest court and, accordingly, remain unexhausted for purposes of federal *habeas* review.  See, e.g., Hayward v. Brown, No. 09 Civ. 6495(LAK)(AJP), 2010 WL 2629037, at *28 & nn.49-50 (S.D.N.Y. July 1, 2010) (collecting cases and determining that, where letter seeking leave to appeal discussed some claims at length and referred to, but did not specifically request review of, other issues identified in the enclosed appellate briefs, those other undiscussed claims were not fairly presented for purposes of *habeas*

review).  Petitioner is now procedurally barred from seeking to raise this claim again in state

court and fully exhaust it.  N.Y. Ct. Rules § 500.20(a)(2) (only one application seeking leave to

appeal may be filed by criminal defendant); N.Y. Crim. Proc. Law § 440.10(2)(a) (claim raised

on direct appeal and denied on merits by Appellate Division may not be raised again by way of

collateral motion).  "Because [petitioner] can no longer obtain state-court review of his present

claim[ ] on account of his procedural default, [the] claim[ is] now to be deemed exhausted."

DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004) (per curiam).  Petitioner has not

asserted cause and prejudice, nor a fundamental miscarriage of justice, that would allow this

Court to circumvent this procedural default and review the merits of the claim.  (See Pet'r's

Reply, at 12-13.)  This Court is precluded from further review and therefore Claim Four must be

denied.[22]

------------------------------------------------

[22] In any event, even if Petitioner fairly presented Claim Four in his letter application
seeking leave to appeal, the claim is not cognizable upon federal *habeas* review.  First, it is clear
that Petitioner failed to identify a federal basis for the claim on direct appeal.  The brief does not
cite federal or state cases employing constitutional analysis, argue the claim in terms so
particular as to call to mind a specific right protected by the Constitution, or allege a pattern of
facts within the mainstream of constitutional litigation.  See Daye, 696 F.2d at 194.  Second, it is
clear that a claim alleging violations of People v. Rosario, 9 N.Y.2d 286 (1961) constitutes a
state-law claim not cognizable upon federal *habeas* review.  28 U.S.C. § 2254; Estelle v.
McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to
reexamine state-court determinations on state-law questions"); see also, e.g., Taylor v. Rivera,
No. 07 Civ. 8668(PKC)(DF), 2011 WL 4471919, at *29 (S.D.N.Y. April 18, 2011) (Report &
Recommendation), adopted by 2011 WL 4472146 (S.D.N.Y. Sept. 27, 2011), aff'd, 509 F.
App'x 51 (2d Cir. 2013) (collecting cases and noting that a claim based on a Rosario violation
arises under state law only and therefore is not cognizable upon federal *habeas* review).  Finally,
to the extent Petitioner argues in his *habeas* reply brief that his federal constitutional right to a
fair trial was violated because of the prosecution's failure to turn over these notes, (see Pet'r's
Reply, at 12-13), it is well-settled that an argument raised for the first time in a reply brief need
not be considered.  Mills v. Luplow, 391 F. App'x 948, 951 n.3 (2d Cir. 2010); see also, e.g.,
Mathieu v. Giambruno, No. 05 Civ. 8098(JSR)(MHD), 2008 WL 383509, at *2 n.2 (S.D.N.Y.
Feb. 11, 2008).  In any event, such a claim was not raised on appeal or exhausted in state court.
The claim may be deemed exhausted because Petitioner no longer has remedies available in the
state courts to raise and exhaust such a record-based claim.  N.Y. Crim. Proc. Law §

5.      _Interpreter Qualification (Claims Five and Eight)_

At trial, the interpreter translating Nelson's testimony acknowledged that he had erred by stating what he believed the witness had meant instead of providing a literal translation. Specifically, after Nelson was asked how much the shooter weighed, the interpreter translated Nelson's response as: "It was so fast that I really couldn't estimate." Defense counsel, who spoke Spanish, raised an objection. Outside the presence of the jury, the interpreter conceded that Nelson had literally stated "identify," and not "estimate." Defense counsel requested a new translator but did not move for a mistrial. The court discharged the translator, struck the inaccurately translated testimony, and ordered a new translator who started the next day. (See Resp't's Mem., at 53-54; Pro Se Br., at 33.[23])

Petitioner's appellate brief argued that the interpreter's actions deprived him of his federal constitutional rights to a fair trial and to effectively cross-examine witnesses. (See App.'s Br., at 37-38.) Petitioner also argued in his supplemental _pro se_ brief that he "was denied his due process right to a fair trial" and his right to effectively cross-examine witnesses. (Pro Se Br., at 33; see id. at 33-37.) Respondent contends that the claims remain procedurally barred from _habeas_ review because Petitioner failed to raise them in either of his letter applications seeking leave to appeal. (See Resp't's Mem., at 52-53.) In the alternative, Respondent contends that the state court's denial of the claims is neither contrary to, nor an unreasonable application

---

440.10(2)(c); DiGuglielmo, 366 F.3d at 135. As discussed above, Petitioner does not assert cause and prejudice or a fundamental miscarriage of justice that would enable this Court to circumvent this default and review the merits of any such fair trial claim.

Accordingly, even if Claim Four was fairly presented to the New York State Court of Appeals, the claim must now be denied.

[23] Transcripts of this testimony and the court proceedings that followed have not been provided.

of, clearly established federal law.  (See id. at 53-55.)  I agree with Respondent in part.

As noted above, the letter written by appellate counsel requesting leave to appeal to the New York Court of Appeals specifically discussed the issues identified in Claims One, Two, and Three only.  (Ex. 18, at 1-4.)  The letter also stated that, "[a]s to the remaining issues on appeal and to supplement the issues presented herein, appellant respectfully refers the Court to the main brief on appeal and appellant's pro se brief, the arguments of which are incorporated herein by reference."  (Id. at 4.)  As discussed above, such language is insufficient to fairly present the claims not discussed in that letter to the state's highest court.  Accordingly, Claim Five remains unexhausted, yet may be deemed exhausted because Petitioner is now procedurally barred from seeking to raise and exhaust it in state court.  N.Y. Ct. Rules § 500.20(a)(2); N.Y. Crim. Proc. Law § 440.10(2)(a).  Petitioner has not asserted cause and prejudice for this default, nor has he alleged a fundamental miscarriage of justice.  (See Pet'r's Reply, at 13-14.)  Accordingly, this Court is precluded from further review of Claim Five.  It must therefore be denied.

However, Petitioner did identify this issue in his pro se letter to the Court of Appeals and specifically requested that the court grant him leave to appeal on this basis.  (Ex. 19, at 4-5.)  Accordingly, Claim Eight has been fully and fairly exhausted.  The Second Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address the claim.  See Ylst, 501 U.S. at 803.  It is clear that it denied the claim on the merits.  Specifically, it held: "[t]he defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit."  Banks, 905 N.Y.S.2d at 629.  It is clear that such language constitutes a denial on the merits for purposes of federal habeas review.  Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002) (claim is adjudicated on the merits where a state court dismisses it by stating "[d]efendant's remaining contentions are without merit").  Accordingly, I

address Claim Eight pursuant to AEDPA's deferential standard of review.

The Confrontation Clause of the Sixth Amendment of the U.S. Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. Amend. VI. This right of confrontation embodies the right of the defendant to "a meaningful opportunity to present a complete defense." Crane, 476 U.S. at 690 (internal quotation marks and citation omitted). This right also "'means more than being allowed to confront the witness physically.'" Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 315 (1974)). Specifically, it includes the "'opportunity of cross-examination.'" Id. (quoting Davis, 415 U.S. at 315-16) (emphasis omitted). This right, however, is not absolute. See, e.g., Taylor v. Illinois, 484 U.S. 400, 411 (1988); Chambers, 410 U.S. at 302; Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001). The right to present evidence "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)).

First, the state court's denial of this claim was not contrary to clearly established federal law. Indeed, as several courts in this Circuit have recognized, "[t]he Supreme Court has never decided what degree of interpretive assistance is constitutionally required for non-English speaking defendants." Singleton v. Conway, No. 10 Civ. 6505(MAT), 2011 WL 5187958, at *3 (W.D.N.Y. Nov. 1, 2011); see also, e.g., Maynard v. Brown, No. 07 Civ. 10480(WHP)(FM), 2009 WL 960075, at *8 (S.D.N.Y. Mar. 11, 2009); Rivera v. Burge, No. 03 Civ. 2596(PKC)(GWG), 2004 WL 1276711, at *11 (S.D.N.Y. June 10, 2004); Sin v. Fischer, No. 01 Civ. 9376(GEL), 2002 WL 1751351, at *2 (S.D.N.Y. July 26, 2002); Phillips v. Miller, No. 01 Civ. 1175(DF), 2000 WL 33650803, at *9 (S.D.N.Y. Dec. 3, 2000). Instead, the Court has held that the appointment of an interpreter is "a matter largely resting in the discretion of the trial

court." Perovich v. United States, 205 U.S. 86, 91 (1907).  Accordingly, Petitioner's argument does not entitle him to relief under the "contrary to" provision of AEDPA.  28 U.S.C. § 2254(d)(1).

Second, the state court's decision cannot be said to be an "unreasonable application of" clearly established federal law.  Id.  The Second Circuit has held that the right to a fair trial includes the right to competent language interpretation for non-English speaking defendants.  In United States *ex rel.* Negron v. New York, 434 F.2d 386 (2d Cir. 1970), the defendant spoke no English, his attorney spoke no Spanish, and almost no interpretation services were provided to him, either pretrial or during the four-day trial.  The Second Circuit held that it was a "nearly self-evident proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense."  Negron, 434 F.2d at 389.  It also found it "axiomatic that the Sixth Amendment's guarantee of a right to be confronted with adverse witnesses . . . includes the right to cross-examine those witnesses as an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."  Id.  Finally, it noted that, "as a matter of simple humaneness, Negron deserved more than to sit in total incomprehension as the trial proceeded."  Id. at 390.

In contrast to Negron, the translation error in Petitioner's trial was minor.  Moreover, defense counsel objected and requested that the interpreter be discharged.  The court granted that application and struck the incorrect testimony from the record; no other objections were raised. Petitioner fails to identify a translation issue that is analogous Negron.  Indeed, other courts within this Circuit have found that, where minor translation errors are corrected by the trial court, federal *habeas* relief is not warranted.  See, e.g., Singleton, 2011 WL 5187958, at *3

(*habeas* relief not warranted where no objections were raised by defense counsel after court discharged two incompetent interpreters and replaced them with competent interpreters who translated the remainder of the trial via speakerphone); Pham v. Beaver, 445 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2006) (*habeas* relief not warranted where defense counsel objected to adequacy of translations by court interpreter; trial court required court interpreter to switch roles with defendant's interpreter; prosecutor asked follow-up questions; trial court instructed jury regarding incorrect translation; and no uncorrected translation error appeared in record).  Claim Eight should therefore be denied.

> **6.      *Legally Insufficient Evidence and Weight of the Evidence (Claim Six)***

Petitioner argues, as he did in his *pro se* appellate brief, that the evidence was legally insufficient to support his conviction and that the weight of the evidence adduced at trial was contrary to the jury's verdict.  (See Pro Se Br., at 23-29.)  Respondent contends that the state court's decision denying this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  (See Resp't's Mem., at 56-58.)  Respondent is correct.

The Second Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address Claim Six.  See Ylst, 501 U.S. at 803.  It is clear that it denied the claim on the merits.  Specifically, it held:

> Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.  Moreover, upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt was not against the weight of the evidence . . . .

Banks, 905 N.Y.S.2d at 629 (internal citations omitted).  Accordingly, I address Claim Six

pursuant to AEDPA's deferential standard of review.[24]

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 315 (1979) (internal quotation omitted). However, on *habeas* review, a claim of legally insufficient evidence will not succeed where, "after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. A *habeas* petitioner, therefore, "bears a very heavy burden" to show that no rational jury could have found the substantive elements of the offense beyond a reasonable doubt and succeed on such a claim. Fama, 235 F.3d at 811 (internal quotation omitted). In addition, "when it considers the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime." Id.

Petitioner has failed to establish that, at the time he was convicted, no reasonable jury could have found him guilty of murder in the first degree, attempted murder in the first degree, assault in the first degree, robbery in the first degree, and reckless endangerment in the first degree. The record indicates there was sufficient evidence from which a rational jury could find each element of these offenses beyond a reasonable doubt. Specifically, *four* eyewitnesses testified and identified Petitioner as the individual who robbed the store and shot the victims. The credibility of the witnesses' testimony are decisions to be made by the jury and are not matters reviewable by a federal *habeas* court. See Marshall v. Lonberger, 459 U.S. 422, 434

---

[24] This claim is fully exhausted. Petitioner's supplemental *pro se* letter seeking leave to appeal to the New York State Court of Appeals specifically identified this claim and requested review on this basis. (Ex. 19.)

(1983); see also United States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (quoting United States

v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998)) ("In analyzing a sufficiency of the evidence claim,

'[w]e defer to the jury's determination of the weight of the evidence and the credibility of the

witnesses, and to the jury's choice of competing inferences that can be drawn from the

evidence.'").  Petitioner's argument that the witnesses were unbelievable and/or unpersuasive

simply fails to meet his heavy *habeas* burden to show that *no* rational jury could find him guilty

beyond a reasonable doubt.  The state court's denial of this aspect of Claim Six was therefore

neither contrary to, nor an unreasonable application of, clearly established federal law.  The

argument should be denied.

      It is also well-established that a weight of the evidence claim is exclusively a matter of

state law and consequently does not present a federal question necessary for federal *habeas*

review.  See, e.g., McKinnon, 422 F. App'x at 75 ("the argument that a verdict is against the

weight of the evidence states a claim under state law, which is not cognizable on habeas

corpus"); Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (a weight of the

evidence claim is a state law claim arising under N.Y. Crim. Proc. Law § 470.15 and therefore

does not present a federal question); Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y.

2002) (a weight of the evidence claim is "an error of state law, for which habeas review is not

available"); see also Estelle, 502 U.S. at 67-68 ("we reemphasize that it is not the province of a

federal habeas court to reexamine state-court determinations on state-law questions").

Accordingly, Petitioner's weight of the evidence argument must be denied.

      **7.**    ***Emotional Spectator (Claim 7)***

      After Jose made an in-court identification of Petitioner as the shooter, a spectator in the

audience yelled something out loud in Spanish.  After this outburst, the prosecutor objected, the

jury was excused, and defense counsel moved for a mistrial.  The court denied that application

and instructed the audience to sit quietly or else they would be asked to leave.  It did not give the

jury a curative instruction.[25]  (See Tr., at 515-19.)  Petitioner now argues that the court erred by

---

[25] The transcript states the following:

Q.    When you looked at the group of six persons, did you recognize anyone in
      that group?
A.    Yes, I did.
Q.    Who did you recognize?
A.    From the lineup?
Q.    Yes.
A.    The one who shot me.
Q.    And did you tell everyone that?
A.    Yes, I did.
Q.    And, sir, can you take a look around our courtroom and tell this jury if you
      see in court today the person who shot you on July 3rd, 2005?
A.    Yes.
Q.    Would you point him out, please?
A.    It is that gentleman over there.

| | |
|---|---|
| [PROSECUTOR]: | Objection, your Honor. |
| [DEFENSE COUNSEL]: | The outburst, your Honor. |
| THE COURT: | Indicating the defendant. All right jurors, take a ten-minute break and don't discuss the case, please. |

. . .

| | |
|---|---|
| [PROSECUTOR]: | Your Honor, when the witness answered the question, the end of his sentence was ["]that's the man who shot me, that's the killer,["] and the audience members said the same thing, ["]that's the killer.["] |
| THE COURT: | She said that in Spanish? |
| [PROSECUTOR]: | In Spanish. |
| THE COURT: | I am glad it was said in Spanish . . . I didn't understand what she said. |
| [PROSECUTOR]: | The witness also said it. |
| THE COURT: | The reality is nothing should have been said by the person in the audience . . . . |
| [DEFENSE COUNSEL]: | It came with an emotional outburst and we demand a mistrial. |
| THE COURT: | Well, I am not going to grant that application. Do you have something short of that [defense |

43

denying his request for a mistrial and by failing to give the jury a curative instruction.  (See Pro Se Br., at 30-32.)  Respondent contends that the claim fails to raise a federal question that is cognizable on *habeas* review.  (See Resp't's Mem., at 59-61.)  I agree with Respondent that the claim should be denied.

The Second Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address the claim.  See Ylst, 501 U.S. at 803.  It is clear that it denied the claim on the merits.  See Banks, 905 N.Y.S.2d at 629 (holding "[t]he defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit"); see also Brown, 283 F.3d at 498.  Accordingly, I address Claim Seven pursuant to AEDPA's deferential standard of review.[26]

> Central to [a criminal defendant's] right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."

Holbrook v. Flynn, 475 U.S. 560, 567 (1986) (quoting Taylor v. Kentucky, 436 U.S. 478, 485 (1978)); see also Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to

_____

> counsel]?  What do you want me to do, explain to the jury that the woman shouted out ["]he's the killer["] when he said it in Spanish? . . . The woman was emotional, I didn't understand it, I heard something but I certainly didn't understand it.

(Tr., at 515-16; see id. at 515-19.)

[26] Petitioner fully and fairly exhausted this claim because he specifically requested that the New York State Court of Appeals review the claim in his letter application seeking leave to appeal.  (Ex. 19, at 3-4.)

prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."); Fama, 235 F.3d at 813 (quoting Sheppard v. Maxwell, 384 U.S. 333, 358 (1966) and Irvin v. Dowd, 366 U.S. 717, 728 (1961)) ("A criminal defendant has the right to a fair trial not conducted in a 'carnival atmosphere,' . . . and not dominated by a 'wave of public passion.'").

Certain state-compelled action may violate a defendant's right to a fair trial.  For instance, in Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court held that a state's practice of compelling a defendant to wear prison garb at trial violated the Fourteenth Amendment.  However, in Holbrook v. Flynn, 475 U.S. 560 (1986), the Court held that a practice of uniformed state troopers seated in spectator seats directly behind the defendant did not violate the right to a fair trial because no "unacceptable risk" that "impermissible factors" affecting the jury's verdict was shown.  475 U.S. at 570 (citing Williams, 425 U.S. at 505).

In Carey v. Musladin, 549 U.S. 70 (2006), the Court specifically distinguished private actor, spectator conduct from government-sponsored action.  In that case, members of the victim's family wore buttons bearing the victim's photo while seated in the well of the courtroom during trial.  549 U.S. at 72.  On federal *habeas* review, the Ninth Circuit determined that the state court's denial of the petitioner's fair trial claim was an unreasonable application of Williams and Flynn.  Id. at 73-74.  The Supreme Court reversed, stating:

> In contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of . . . spectator conduct . . . is an open question in our jurisprudence. This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial. And although the Court articulated the test for inherent prejudice that applies to state conduct in Williams and Flynn, we have never applied that test to spectators' conduct.

Id. at 76.  "Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct," the Court held that the state court's decision was neither

45

contrary to, nor an unreasonable application of, clearly established federal law.  Id. at 77.

The same rationale applies in this case.  At Petitioner's trial, a spectator in the audience uttered a single, isolated outburst in Spanish.  The state court's decision denying this claim cannot be said to be contrary to, or an unreasonable application of, clearly established federal law regarding such private actor, spectator conduct.  Moreover, to the extent Petitioner contends that the trial judge erred in determining that the jury was not affected by this conduct, Petitioner fails to meet his burden and show that the decision was incorrect.  A trial court's determination of the effect that an outburst has "on jurors' ability to render an impartial verdict is a 'question[ ] of historical fact' which 'must be determined, in the first instance, by state courts and deferred to, in the absence of convincing evidence to the contrary, by the federal courts.'"  Lyon v. Senkowski, 109 F. Supp. 2d 125, 138 (W.D.N.Y. 2000) (quoting Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curiam)); see § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); see also Fama, 235 F.3d at 813 ("[o]n § 2254 review, the state trial court is entitled to its conclusion that the jury was impartial").  Here, there is no indication in the record that the remark was translated or understood by the jury.  Indeed, the judge herself noted that she did not understand what the spectator said until counsel translated it for her.  Without more, Petitioner's conclusory assertion that the outburst improperly affected the jury's decision is insufficient to warrant *habeas* relief.

Claim Seven should therefore be denied.

## IV.  CONCLUSION

For the reasons set forth above, I conclude–and respectfully recommend that Your Honor should conclude–that the petition should be **DENIED**.  Further, because reasonable jurists would

not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he

was denied a constitutional right, I recommend that no certificate of appealability be issued.  See

28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

Dated: October 9, 2013
       White Plains, New York

                                        Respectfully Submitted,

                                        _____
                                        Paul E. Davison
                                        United States Magistrate Judge

## NOTICE

   Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total

of seventeen (17) days, from service of this Report and Recommendation to serve and file

written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections, if any, along with

any responses to the objections, shall be filed with the Clerk of the Court with extra copies

delivered to the chambers of the Honorable Nelson Stephen Román, at the Honorable Charles L.

Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains,

New York 10601, and to the chambers of the undersigned at the same address.  Failure to file

timely objections to this Report and Recommendation will preclude later appellate review of any

order of judgment that will be entered.  Requests for extensions of time to file objections must be

made to Judge Román.

        Andre Banks, pro se
        07-A-5721
        Clinton Correctional Facility
        P.O. Box 2000
        Dannemora, New York 12929